**E-FILED**
Friday, 26 April, 2013  08:58:06 AM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| LEE A. DRAPER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 11-3306 |
| | ) | |
| CAROLYN W. COLVIN, ACTING | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

RICHARD MILLS, U.S. District Judge:

Pending are Motions for Summary Judgment filed by the Plaintiff and the Defendant.[1]

## I. INTRODUCTION

Plaintiff Lee A. Draper filed a Complaint, wherein he requested that the Appeals Council's decision denying the request for review of the Administrative Law Judge's (ALJ) denial of his claims be reviewed, reversed

---

[1]On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security.  Pursuant to Federal Rule of Civil Procedure 25(d), Carolyn W. Colvin is automatically substituted as the Defendant.

and set aside.  The Plaintiff requests that the Court allow his claim for a period of Disability and Disability Insurance Benefits from June 24, 2009 to the present, and in the future.  In support of the claim, the Plaintiff contends that the ALJ did not follow the applicable regulation in finding that he was able to perform sedentary work and in considering the credibility of the evidence of the documented side effects of the Plaintiff's medications in determining he was able to perform sedentary work.  The Defendant Commissioner of Social Security ("the Commissioner") contends substantial evidence supports its decision.

## II. BACKGROUND

### A. Medical Evidence

On July 30, 2009, the Plaintiff filed applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI), wherein he alleged he became disabled on June 24, 2009 due to back injuries, high blood pressure, and nerve problems in the leg and hand.  His claims were denied initially and upon reconsideration.  A timely request for hearing was filed.  On December 2, 2010, the Plaintiff appeared and testified at a video

hearing before an ALJ.  Linda M. Gels, a vocational expert, also testified at the hearing.

At the time of the hearing, the Plaintiff was 47 years old and a high school graduate.   The Plaintiff's past relevant work was that of Construction/Laborer.

In September 2008, the Plaintiff saw Gordon K. T. Chu, M.D., and reported complaints of lower back pain that radiated down the left and right legs but that was worse on the left side.  On examination, Dr. Chu noted that Plaintiff's strength in the lower extremities was 5/5 bilaterally and sensation was normal to light touch and proprioception, but there were no knee or ankle jerks.   Straight leg raising was negative and the cardiovascular, respiratory and abdominal exams were all within normal limits.  Dr. Chu noted that the magnetic resonance imaging (MRI) scan of the lumbar spine showed a lumbar scoliosis with a left-sided concavity at L2-3, and a right-sided concavity at L4-5.  Dr. Chu did not believe that Plaintiff needed surgical intervention and he recommended epidural injections at L-3-4, L4-5 and L-5S1, which had previously worked for the

Plaintiff.  Dr. Chu further recommended that Plaintiff receive the injections every three to four months.

In October 2008, the Plaintiff saw Bart Wetzel, M.D. for lumbar epidural injections.

In January 2009, the Plaintiff saw Joseph Williams, M.D., at the Orthopaedic Center of Illinois for low back pain.  He had been referred to Dr. Williams by Ross Billiter, M.D., his family physician.  On examination, the Plaintiff's muscle strength was 5/5 throughout the lower extremities, his calves were soft and non-tender, sensation to light touch was grossly intact, his gait was normal, and his straight leg raise test was negative bilaterally.  Dr. Williams assessed the Plaintiff as having chronic lower back pain and lumbar spondylosis.  He did not believe the Plaintiff was a candidate for surgery at the time.  The Plaintiff had degenerative changes present at every level and had no significant findings consistent with nerve root compression or central stenosis.  Therefore, Dr. Williams recommended that Plaintiff be evaluated by a physiatrist.

In February 2009, the Plaintiff returned to the Orthopaedic Center

4

of Illinois and was seen by John Watson, M.D., for back and bilateral leg pain.  Dr. Watson assessed the Plaintiff as having lumbar degenerative disc disease, worse at L5-S1 with severe neural foraminal narrowing in a bilateral L5-S1 radiculopathy; lumbar degenerative disc disease early at L2-3; and chronic pain with chronic opiate therapy.  Dr. Watson recommended a bilateral S1 transforaminal epidural steroid injection, which the Plaintiff received on February 20, 2009.  His post-injection diagnosis was lumbar degenerative disc disease with bilateral lower extremity radiculopathy.

In January 2009, the Plaintiff told Dr. Billiter that the epidural injections at first helped to relieve his pain.  By July 2009, the Plaintiff reported to Dr. Billiter that the injections had not helped and he wished to see Dr. Russell, who had been recommended by a friend.  On August 14, 2009, Dr. Billiter noted that Plaintiff's straight leg raise was not too bad, his patella reflexes were symmetrical and he could walk on his heels and toes.

In October 2009, the Plaintiff had an electromyogram/nerve conduction velocity (EMG/NCV) study performed, which showed a mild

5

subacute to chronic left LS radiculopathy with evidence of reinnervation without denervation.  In November 2009, the Plaintiff saw Dr. Brian Russell for follow-up on his lumbar disc degeneration.  Dr. Russell observed that Plaintiff did not appear to have much improvement with conservative measures and his EMG/NCV showed LS root irritation.  The Plaintiff told Dr. Russell he wished to consider surgery.  Dr. Russell talked with him about the risks involved with doing a micro decompression at the L4-5 and 5-1 levels.  The Plaintiff wished to proceed with surgery in the near future.

On October 29, 2009, the Plaintiff appeared for a consultative examination with Raymond Leung, M.D., at the request of a state agency. The Plaintiff reported disability due to hypertension and low back pain. On physical examination, Dr. Leung noted that Plaintiff walked with a mild limp and his gait was stiff.  He could tandem walk, heel and toe walk, but made no attempt to hop.  Straight leg raising in the left leg was limited to 30 degrees and the right leg was limited to 40 degrees.  The Plaintiff had decreased range of motion in the lumbar spine but his arm, leg and grip strength were 5/5 throughout and he had no difficulties getting on and off

6

the exam table.  Based on the examination, Dr. Leung diagnosed the Plaintiff with hypertension and back pain.

An MRI of the lumbar spine performed on November 9, 2009 showed severe degenerative changes, most significant at the L5-S1 level with severe bilateral neural foraminal stenosis and the L4-L5 level with moderate to severe right lateral recess stenosis.

On November 23, 2009, Dr. Russell performed a decompressive micro-laminotomy, L4-5, L5-S1, with microdiskectomy and a foraminal decompression at L5-S1.  At his first post-operative visit on December 11, 2009, the Plaintiff appeared to be doing very well and did not have any significant radiating leg pain.  Dr. Russell noted that Plaintiff was free to drive, though he should not do any heavy lifting or strenuous activity.  An x-ray of the lumbar spine in January 2010 showed moderate to severe diffuse degenerative changes that was most prominent at the L-2–L-3 and L5-S1 levels.

In January 2010, the Plaintiff reported to Dr. Russell that he fell while emerging from the bathtub and now had pain in his back, left hip, and

proximally into his left leg. The x-rays did not show any fractures and there was no unusual instability. Dr. Russell observed that Plaintiff did have some paraspinous muscle spasms and initiated a course of physical therapy with some local modalities. At a follow-up visit in February 2010, the Plaintiff reported that while the therapy did help, it did not completely resolve the discomfort in his left leg. An MRI on March 3, 2010 showed multilevel degenerative and postoperative changes.

On July 22, 2010, the Plaintiff had a posterior lumbar interbody fusion, L4 to sacrum; lumbar diskectomy; and interbody spacer placed at L5-S1 performed by Dr. Russell and Dr. Stephen Pineda. He received physical therapy twice a week after his back surgery. His therapist observed that Plaintiff had been compliant with all physical therapy recommendations and his plan of care. The therapist noted on October 29, 2010 that Plaintiff had shown progress with decreasing pain, improving posture, improving gait abilities, and improving dynamic lumbar stability. At a follow-up visit with Dr. Russell on August 4, 2010, the Plaintiff denied any significant right-sided symptoms but did report still having some pain

in the left side of his back.  By August 20, 2010, Dr. Russell noted that Plaintiff was starting to make some improvement and reported much less pain down into his legs, though he still reported some achiness in his hip proximally to his left leg.

B. Plaintiff's Testimony

At the hearing held on December 2, 2010, the Plaintiff testified he was a 47-year old divorced man with a high school education who lived with his 9-year old son in a two-story house.  He had last worked as a laborer in 2006, but quit because of back problems.  The Plaintiff received unemployment but never received worker's compensation.  In the previous 15 years, the Plaintiff had done work only as a laborer.

The Plaintiff testified that he had a disabling back problem and had two surgeries on his lower back.  The Plaintiff stated that he had no other medical conditions.  He testified that because of the back problem, he had problems with basic work functions such as standing, walking, sitting, lifting and carrying.  The Plaintiff stated his doctor told him not to lift anything heavier than a gallon of milk.  The Plaintiff reported that he has

9

a sharp pain in his back with movement and has constant numbness and a burning pain in his leg.  He testified that physical activity increases this pain.  Aside from medication, the Plaintiff uses a heat pad to relieve his pain.  The Plaintiff estimated that he could lift ten pounds and in an eight-hour day, he estimated that he could walk for an hour and a half or two hours, stand for an hour to an hour and fifteen minutes, and sit for 10 to 15 minutes at a time for about an hour.  The Plaintiff has a driver's license with no restrictions and has had no problems with the steering wheel or pedals, although the Plaintiff said he would not be able to use a clutch.

The Plaintiff testified he was referred to Dr. Russell in October 2009.  Dr. Russell began by giving him injections in his back but when that did not work, he performed two surgeries.  One was in November 2009 to repair a pinched nerve and one in 2010 for a fusion of his spine at L4-L5, after the first procedure did not work.  At the time of the hearing, Dr. Russell had the Plaintiff in therapy in order to rebuild his muscles.  Dr. Russell restricted him to no driving and no lifting after the surgery.  His therapist told him to go slow and to try not to turn or twist too quickly.

For medication, the Plaintiff was taking Flexeril, Hydrocodone, three blood pressure pills per day, Diazepam, and Ibuprofen.  Although the medication helped to relieve his pain, it did cause side effects such as forgetfulness and feeling run down.

The Plaintiff testified that on a typical day, he woke up at 6:30 a.m., took his medication and ate breakfast.  He then woke up his son and made him breakfast before walking him halfway to school a block away before 8:00 a.m.   Upon returning home, the Plaintiff usually sat in his recliner and used his heating pad for up to an hour.  During a typical day, the Plaintiff would eat lunch, do the dishes and sit in his recliner until his son got home around 3:00 p.m.  The Plaintiff testified that he could dress, groom, and bathe himself and go grocery shopping.  He said he has a cleaning lady who does most of the sweeping and vacuuming, though the Plaintiff occasionally did those activities.   The Plaintiff testified that although he did not have any hobbies, he enjoyed taking his son fishing. His exercise included his physical therapy home exercises.

The Plaintiff testified that he had no psychological condition that

interfered with his ability to work.  He had pain all day, every day.  The pain in his lower back was extensive and sharp.  It went into his lower left leg, which felt numb and sometimes caused a burning sensation.  The heating pad helped somewhat with the pain.

C. The ALJ's Decision

The ALJ found that Plaintiff had met the disability insured status requirements of the Act through September 30, 2010, and that he had not engaged in substantial gainful activity since his alleged onset date of June 24, 2009.  The ALJ found that Plaintiff had the severe impairment of degenerative disc disease.  However, the impairment did not, singly or in combination, meet or medically equal any of those listed in the Listing of Impairments at 20 C.F.R. Part 404, Subpart P, Appendix 1.  The ALJ found that Plaintiff had the residual functional capacity (RFC)[2] to perform sedentary work as defined by 20 C.F.R. §§ 404.1567(a) 416.967(a), except that he could only occasionally push/pull with the lower extremity, climb ramps and stairs, balance, stoop, kneel, crouch and crawl.  He could never

_____

[2]"Residual functional capacity" refers to what an individual can still do, despite his or her limitations.  20 C.F.R. § 404.1545(a).

climb ladders, ropes, or scaffolds. He was limited to constant feeling with both hands and was required to avoid concentrated exposure to hazards. The ALJ found that Plaintiff was unable to perform past relevant work.

The ALJ found that, upon considering the Medical-Vocational Guidelines (grids) as a framework, along with the testimony of the vocational expert, the Plaintiff could perform a significant number of other jobs in the national economy and thus was not disabled.

## III. DISCUSSION

The Plaintiff raises two issues on appeal. He alleges that the ALJ failed to follow Social Security Ruling 96-7p when he did not consider the Plaintiff's chronic pain in finding that he was able to perform sedentary work. Moreover, the Plaintiff asserts that the ALJ did not consider the credibility of the evidence of the documented side effects to the Plaintiff's medications when he found that Plaintiff was able to perform sedentary work.

A. Standard of review

Because the Appeals Council denied review, the ALJ's decision stands

13

as the final decision of the Commissioner. *See Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010). The question before the Court is whether substantial evidence supports the ALJ's findings. *See id.* The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind accepts as adequate to support a conclusion." *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is not the role of a court to "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) (citations omitted).

Although the Plaintiff bears the burden of proving a disability, the ALJ must develop a full and fair record. *See Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000). Although he need not address every piece of evidence or all of the testimony, the ALJ must build a "logical bridge" which connects the evidence to his conclusion. *See Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008). A reviewing court should "give the opinion a commonsensical

14

reading rather than nitpicking at it." *Rice*, 384 F.3d at 369 (citations omitted).

### B. ALJ's consideration of credibility as to pain

Social Security Ruling 96-7p provides, in part, "In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." Before determining whether a claimant is disabled, the Social Security Administration considers the individual's "statements about the intensity, persistence and limiting effects" of the symptoms and "evaluate[s] [the] statements in relation to the objective medical evidence and other evidence." *See* 20 C.F.R. § 404.1529(c)(4).

In contending that the ALJ did not properly consider his credibility as to chronic pain, the Plaintiff points to the following boilerplate language

15

in the ALJ's decision:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

*See* Tr. 16.  The Plaintiff alleges that this boilerplate statement suggests that the ALJ did not consider the record as a whole.  The United States Court of Appeals for the Seventh Circuit has described similar language  that frequently appears in ALJ's opinions as "meaningless boilerplate."  *See Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010).  The Seventh Circuit has also stated:

> [T]he ALJ's determination or decision regarding claimant credibility must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight. . . .  [I]t is not sufficient for the adjudicator to make a single conclusory statement that the individual's allegations have been considered or that the allegations are (or are not) credible.  It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms.

*Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) (internal quotation marks and citations omitted).

The Plaintiff notes that throughout the ALJ's decision, there are numerous references to the Plaintiff's chronic pain.  Despite these repeated references in the record to such pain, the Plaintiff contends that the ALJ did not give any meaningful consideration as to the credibility of the pain evidence and/or the effect of this pain on his ability to do sedentary work. Based on the ALJ's rejection in boilerplate fashion of the Plaintiff's complaints and other evidence of chronic pain which are in the record, the Plaintiff contends that the RFC assessment should not be upheld by the Court.

In asserting that the ALJ properly considered the Plaintiff's credibility with respect to his claims of pain, the Commissioner notes that the often-criticized boilerplate language alone is not enough to support a finding of disability.  The use of such language is harmless if the ALJ provides additional reasons for his finding.  *See Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012); *Shideler v. Astrue*, 688 F.3d 306, 311-12 (7th Cir. 2011).

17

Thus, a remand is not necessary if the ALJ's credibility assessment is otherwise supported.

The Commissioner contends that in rendering a decision, the ALJ did not simply rely on the "meaningless boilerplate." He found:

> In terms of the claimant's alleged more severe restrictions, the undersigned finds them not fully credible at this time for several reasons (20 CFR 416.929(c), SSR 96-7p). Although the claimant has received various forms of treatment for allegedly disabling symptoms, which would normally weigh somewhat in the claimant's favor, the record also reveals that the treatment has been generally successful in controlling those symptoms. The record shows that the claimant received epidural injections to treat his back pain and reported a decrease in pain after those injections. Several doctors noted that surgery was not the best option for the claimant, with one doctor noting that this was due, at least in part, to the claimant's continued smoking. (Exhibit 1F, 3F, 6F). Dr. Chu recommended that the best option for the claimant would be to receive epidural injections every three to four months (Exhibit 1F, 6F). However, despite these doctors' recommendations, the claimant sought a referral to Dr. Russell, who, after only a few visits in less than two months, performed back surgery on the claimant (Exhibit 9F, 10F). Despite the fact that previous doctors had not recommended surgery, the claimant appeared to respond well to the treatment (Exhibit 10F). Furthermore, after a second surgery in July 2010, the claimant reported that his pain was decreasing and he was responding well to physical therapy (Exhibit 16F). Therefore, while the claimant has sought treatment for his back problems, he has not always followed the advice and recommendation of his doctors. However, even

then, his doctors have reported that the claimant has had a positive response to treatment and his pain is decreasing (Exhibit 16F).

Additionally, the claimant described daily activities that are not limited to the extent one would expect given the complaints of disabling symptoms and limitations. The claimant testified and reported that he is able to cook, do light housework, do the dishes, laundry, and go grocery shopping (Exhibit 6E). Furthermore, the claimant also testified that he has custody and cares for his 9-year-old son without any particular assistance. Caring for young children can be quite demanding, both physically and emotionally.

In sum, the record as a whole, including the overall evidence of record, the medical evidence, the claimant's testimony, the claimant's activities, and other factors described above support some functional limitations. However, they do not fully support the credibility of the claimant regarding the severity or frequency of his symptoms as more supportive of any greater limitations or restrictions than those included in the residual functional capacity set forth in the decision. The undersigned has also determined that the record as a whole does not fully support the claimant's subjective allegations about the disabling nature of his impairment to the extent they are inconsistent with the above-described residual functional capacity. Consequently, there is no basis for finding that the claimant has suffered any other symptoms that would further reduce the residual functional capacity described above at any time through the date of this decision. Accordingly, the claimant retains the residual functional capacity to perform a range of sedentary work, except he may only occasionally push/pull with the left lower extremity, climb ramps and stairs, balance, stoop, kneel, crouch and crawl; he may never climb ladders, ropes or

scaffolds; he is limited to constant feeling with both hands; and he must avoid concentrated exposure to hazards.

*See* Tr. 19-20.

The record establishes that the ALJ considered both the objective medical and other evidence of record in determining credibility, as is required. *See* 20 C.F.R. § 404.1529(c). The medical evidence was discussed in detail. The ALJ further observed that based on the Plaintiff's subjective complaints of disabling symptoms and limitations, it might be reasonable to presume that his physicians would have placed specific restrictions on his activities. However, the record contains no such evidence of any permanent restrictions. The ALJ noted that the State Agency physicians concluded that the Plaintiff could perform a limited range of light work and a full range of medium work after November 11, 2009. The ALJ made the reasonable inference that Plaintiff is capable of performing a limited range of sedentary work.

Based on the foregoing, the ALJ did not simply recite the unhelpful boilerplate that is frequently found in such decisions. The ALJ specifically discussed the nature of the Plaintiff's treatment and his response to

20

treatment and his daily activities.  A claimant's course of treatment and activities are relevant in assessing credibility.  *See* 20 C.F.R. § 404.1529(c)(i) & (c)(v).

As the ALJ found, there is evidence in the record that Plaintiff's condition was significantly improved after treatment following the second surgery.  On August 20, 2010, Dr. Russell noted that the swelling was better and the incision had healed.  There was "[m]uch less pain down into his legs, though he still gets some achiness into his left hip proximally into the left leg."  *See* Tr. 423.  Dr. Russell observed that Plaintiff's activities would increase as he tolerates.

Accordingly, the Court concludes that the ALJ properly considered the Plaintiff's credibility with respect to his claims of pain.

## C. ALJ's Consideration of Claims of Medication's Side Effects

The Plaintiff alleges the ALJ failed to follow Social Security Ruling 96-7 when he did not consider the credibility of the evidence of the documented side effects to his medications when he found that Plaintiff was able to perform sedentary work.

21

The Plaintiff reported that he takes Flexeril, a muscle relaxant; Hydrocodone, a pain medication; three blood pressure medications; Diazepam, an anti-anxiety agent; and Aleve, an over-the-county anti-inflammatory.  The ALJ observed, "The claimant said the medication helps to relieve his pain, but he reported the medications do cause side effects such as forgetfulness and feeling run down."  *See* Tr. 16.

The Plaintiff alleges the ALJ did not give meaningful consideration to the credibility of the testimony or other evidence of side effects of the Plaintiff's medication or his ability to do sedentary work.  He contends the ALJ stated only that "the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  *See* Tr. 16.  This boilerplate rejection is not helpful.  Because of the ALJ's incomplete assessment of the credibility of complaints and other evidence regarding the side effects of medication, the Plaintiff contends that the ALJ's RFC finding should not be upheld.

As the Commissioner alleges, the Plaintiff did not explain the degree

of the purported side effects of forgetfulness and feeling run down–specifically, the effects on his functioning and how he knew they were related to medications. The Plaintiff does not point to any part of the record tending to show that he discussed the alleged side effects or other problems with his medications with any of his doctors.

Absent other evidence in the record, the Court in unable to find error with the ALJ's determination as to RFC based solely on the Plaintiff's testimony as to his medication's side effects. *See Rasmussen v. Astrue*, 254 F. App'x 542, 547 (7th Cir. 2007) (rejecting a claim based on medication's side effects when the Plaintiff offered only his own testimony). There is nothing in the record which shows the extent of the Plaintiff's alleged forgetfulness or feeling run-down. Even if the Court were to conclude that these side effects are present, that does not mean they are disabling. *See Burns v. Barnhart*, 312 F.3d 113, 131 (3d Cir. 2002) ("Drowsiness often accompanies the taking of medication, and it should not be viewed as disabling unless the record references serious functional limitations."); *Dodd v. Sullivan*, 963 F.2d 171, 172 (8th Cir. 1992) (observing "there was no

23

evidence in the record that he told his doctors that his medication made him drowsy"); *Essary v. Comm'r of Soc. Sec.*, 114 F. App'x 662, 665 (6th Cir. 2004) ("Although Essary testified that she suffered from dizziness and drowsiness as a result of her medications, Essary's medical records make no indication that Essary reported such side effects to any of her physicians.").

Although the Plaintiff correctly notes that side effects of medication can significantly affect an individual's ability to work, there is no evidence how they affected the Plaintiff in this case.  Many medications have side effects.  However, there is no indication that any alleged side effects were disabling as to the Plaintiff.

Because the Plaintiff did not elaborate on the degree of any side effects and their effect on his functioning, the Court is unable to conclude that the ALJ did not follow the applicable regulation or properly consider the Plaintiff's alleged side effects.

## IV. CONCLUSION

Based on the foregoing, the Court concludes that substantial evidence

24

supports the decision of the Commissioner of Social Security as to the Plaintiff's credibility regarding his alleged pain and side effects of medication and his ability to perform sedentary work.

<u>Ergo</u>, the Motion of Plaintiff Lee A. Draper for Summary Judgment [d/e 14] is DENIED.

The Motion of Defendant Commissioner of Social Security for Summary Affirmance [d/e 17] is ALLOWED.

This case is closed.

ENTER: April 24, 2013

FOR THE COURT:

*s/Richard Mills*
s/Richard Mills
United States District Judge

25